## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 89 C 6111 | **DATE** | 9/19/2002 |
| **CASE TITLE** | Robinson vs. Northrop Grumman | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, plaintiff relators' motion for an evidentiary hearing [659-1] and sanctions pertaining to Northrop Corporation's obstruction of discovery [659-2] and Government's motion for an evidentiary hearing to consider Relators' motion for sanctions [665-1] are denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 10 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 20 2002 | 806 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | WB | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 9/19/2002 | |
| | KF | 02 SEP 19 AM 11:38 | date mailed notice | |
| | courtroom deputy's initials | Date/time received in central Clerk's Office | KF mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

SEP 2 0 2002

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel, REX A. ROBINSON, and JAMES H. HOLZRICHTER, | |
| Plaintiffs, | No. 89 C 6111 |
| v. | Hon. Ronald A. Guzman |
| NORTHROP GRUMMAN CORPORATION, | Mag. Judge Mason |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Before us are similar motions from the plaintiff/relators in this case ("hereinafter, "plaintiffs" or "relators") and the United States Government ("Government"), asking that we hold an evidentiary hearing to consider the plaintiffs' motion for sanctions against defendant Northrop Grumman Corporation ("Northrop"). The plaintiffs have raised serious allegations of discovery abuse against Northrop,[1] and ask that we impose a variety of penalties against it, up to dismissal of the case. Northrop strenuously objects to any allegation that it has abused discovery in this case. Furthermore, it contends that the

---

[1] The relators' allegations include charges of discovery abuse in numerous lawsuits involving Northrop which are not before this Court. For our purposes, the relevant allegations only concern document production connected with this matter, the Robinson case. This case was originally filed as a *qui tam* action under seal in 1989. Between 1989 and 1992, the Government undertook a grand jury investigation that involved the production of thousands of documents from Northrop, culminating in the Government's decision not to intervene in the case. The complaint was unsealed in 1992, and Northrop began responding to the plaintiff's discovery requests in the civil action then. Subsequently, amid the plaintiffs' allegations of discovery abuse, the Government decided to intervene in the civil portion of the case as well as conduct a second criminal inquiry. That criminal matter has since been dismissed.



plaintiffs' present motion is nothing more than a request that we reconsider the decisions of Judges Moran and Rosemond, who previously ruled on various issues concerning Northrop's discovery behavior. Northrop argues that this "motion for reconsideration" should be denied because the only new information or evidence the plaintiffs have in support of it has been shown to be wholly unreliable. We will address each of the parties' arguments in turn.

**The Original Motion for Evidentiary Hearing and Sanctions**

The relators' motion for evidentiary hearing and sanctions, originally filed in November, 2001, alleged four separate categories of discovery abuse by Northrop: 1) destruction of key documents (specifically, the so-called "Chapman attrition documents" and those concerning Bills of Materials "BOMs"); 2) improper resistance to document declassification; 3) false assertion of the attorney-client and/or work product privileges; and 4) purposely conducting incomplete searches for responsive documents. Certain of these allegations have been the subject of previous motions before other judges; so far, no judge has found Northrop liable for discovery abuse. The relators contend that this is because no judge who has previously considered the issue of discovery abuse has been privy to the new information provided in the current briefs.

The plaintiffs' motion before us really has two separate parts. First, we must determine whether there is enough evidence to justify holding an evidentiary hearing on the plaintiffs' claims of discovery abuse; the Government joins in requesting that we hold such a hearing. If we decide to hold a hearing, we will withhold a decision on the plaintiffs' request for sanctions until after its conclusion. Or, we could deny the plaintiffs' request for a hearing, finding either that there is not enough evidence to even justify such a procedure

2

(and thus denying the entire motion outright), or conversely, imposing sanctions against Northrop on the basis of the current briefs.

Attached to the relators' motion were four affidavits from former Northrop employees and consultants, Thomas Pendergrass,[2] Steve Wisniewski,[3] Roger Bright,[4] and Dennis Grider.[5] The affidavits had never before been considered by any judge. Each affidavit states that the affiant has personal knowledge of widespread discovery abuses by Northrop, such as those described above. Before considering the current motion, we allowed Northrop to take the depositions of each affiant; each party then filed a supplement to its previous brief.

After reviewing all of the parties' briefs and exhibits, as well as some of the orders previously entered in this case, we agree with Northrop that the only "new evidence" relevant to our consideration is the four affidavits and the related deposition testimony of each affiant; the question is whether they provide a reason to conduct an evidentiary hearing on the allegations against Northrop. We will not reconsider other judges' decisions regarding specific charges of discovery abuse (such as those regarding the supposedly missing BOMs) unless an affiant demonstrates personal knowledge of the

---

[2] During the time period relevant to the plaintiffs' motion, Pendergrass worked as a manager of litigation support for Northrop's Electronic Systems Division and later, Director of Legal Systems and Services.

[3] During part of the time period relevant to the plaintiffs' motion (June, 1993 to December, 1996), Wisniewski worked as a member of Northrop's litigation support group.

[4] Bright worked for Northrop from 1979 until January, 1991. From 1989 until 1991, he was a member of Northrop's litigation support group. Bright became a member of the California bar in 1990.

[5] Grider worked for outside consultant IPRO from August, 1994 to October, 1995, and again from March through May, 1996. While employed by IPRO, Grider provided litigation document management support for IPRO's client, Northrop.

3

allegation. Additionally, because none of the affiants' testimony relates to the declassification issue – and the parties do not discuss it in their supplemental briefs – we will not consider it in our analysis.[6]

Northrop now asks that we exclude the affidavits from our consideration (and thus, deny the plaintiffs' motion in its entirety) pursuant to Fed.R. Evid. 602, on the ground that the affiants lack personal knowledge about any of the allegations of discovery abuse. Lay witnesses (as opposed to experts) are permitted to testify about matters "only from their personal knowledge." *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). This rule covers both testimony at trial as well as affidavits used in support of or opposition to a motion. *Id.* Although personal knowledge can include inferences and opinions, they must be grounded in observation or first-hand personal experience. "They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from experience." *Id.* at 659, citing *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

**Each Affiants' Personal Knowledge**

As we explain below, the affiants' personal knowledge about document production in the Robinson case is slight at best, and primarily consists of generalities about things the affiants believed to be true about all of the cases for which they provided litigation support. They provide almost no specific evidence or example of any of the discovery

---

[6] For the same reason, we also decline to consider in this opinion the relators' allegation that Northrop falsely asserted the attorney-client privilege over documents connected to an internal audit by Arthur Young & Co. ("AY"). None of the affiants had any connection to the AY project or the production of those documents, and the relators' arguments for finding the AY engagement non-privileged are completely different from the reasons the affiants believe that Northrop wrongly stamped certain documents privileged. We have begun reviewing the parties' briefs regarding the various AY issues and are familiar with the arguments for each side. We will issue a separate opinion dealing with all of the AY issues after briefing is completed.

abuses alleged above. However, the affiants were all involved in the discovery process for Northrop on some level and did handle some of the documents that were produced in Robinson, so we will evaluate whether such involvement is sufficient to survive a Rule 602 challenge. Since each affiant held a somewhat different role in the discovery process at Northrop, we will address each individual's role separately. A common theme for all of the affiants, however, is that they worked primarily in Northrop's California offices, not in Northrop's Rolling Meadows, Illinois, office from which the Robinson case was conducted. Because each affiant worked on litigation support for numerous cases involving Northrop, they were often not certain whether allegedly suspicious activity they observed related to the Robinson case or another matter.

### Pendergrass

Pendergrass is the relators' main witness with regard to the allegations of discovery abuse. His primary role with the Robinson case, however, appears to have been as the temporary custodian of 850 boxes of documents which had been selected by other individuals for production. Pendergrass and some of his subordinates in California were in charge of scanning these documents into Northrop's computer system so that they could be catalogued for easy retrieval during the litigation. Although the relators imply that Pendergrass was specifically asked to "assist with the document production then being done on the Robinson grand jury investigation" (Relator's supplemental brief at 6), in fact, Pendergrass merely testified that before he traveled to Illinois on an unrelated matter, he was asked by his boss in California to look in on the document production going on in Rolling Meadows. At the time, Pendergrass did not know whether the document production was related to a grand jury or the Robinson case. There is very little evidence

about what Pendergrass did to "look in on" the production.

Pendergrass made only one trip to Rolling Meadows to do work specifically for the Robinson case; in 1995 he traveled there to set up equipment for the scanning of documents. Although Pendergrass stated in his affidavit that part of his duties included searching for documents in response to discovery demands, he admitted at his deposition that he did not perform this activity for the Robinson matter. And although Pendergrass testified that he had conversations with individuals in Rolling Meadows about the destruction of documents and incomplete searches, he could not be sure if any of the discussions concerned the Robinson case.[7] More importantly, Pendergrass testified that he had no knowledge that documents destroyed during the Robinson production, if any, were destroyed in order to conceal them from production, as opposed to in the ordinary course of business.[8] Indeed, Pendergrass also testified that when he raised the issue of incomplete document searches or document destruction with Northrop employees, they tried to correct or improve their procedures.

Finally, Pendergrass' knowledge about the wrongful stamping of documents as protected by the attorney-client privilege is equally sparse. He had no responsibility to

---

[7] The issue of whether Northrop paralegal Bonnie Webster-Kwolek purposely conducted an incomplete search for documents has already been addressed on several previous occasions and found to be a meritless allegation. Indeed, even Pendergrass testified that, although on one trip to Rolling Meadows (not related to the Robinson case), Webster-Kwolek told him that she had not searched for documents in Northrop's offsite storage facility, he admitted that he did not even know the scope or purpose of Webster-Kwolek's search, or whether her failure was intentional or accidental.

[8] The relators contend that some of the Chapman attrition documents and BOM documents must have been destroyed because Northrop has been unable to produce certain documents that the relators believe exist. Pendergrass did not testify about anything concerning destruction of either the Chapman attrition documents or the BOM documents and thus we cannot impute his general knowledge that some documents may have been destroyed to these specific allegations. Further, previous judges have considered the relators' arguments concerning these documents and found nothing suspicious about Northrop's behavior.

either select documents for production or make determinations about whether to stamp documents as privileged. The sum total of his evidence that Northrop wrongfully applied the attorney-client privilege designation concerns two documents he saw in the "control room" at Rolling Meadows;[9] Pendergrass formed the opinion that the documents were not really privileged. However, he has no idea if the documents were even part of the Robinson case, or why they had been stamped as privileged; he noted that nothing about the documents appeared incriminating to Northrop. More importantly, he cannot remember enough about the documents (other than the fact that one dealt with scrap and one was a so-called "SP-3"), to allow Northrop to identify them in order to determine whether they actually were privileged. And even if the documents were wrongly stamped, Pendergrass has no evidence that Northrop's purpose in doing so was to prevent their disclosure.

Although Pendergrass does have some personal knowledge about document productions for Northrop in general, he knows little about the Robinson production in particular, other than his work scanning the 850 boxes of documents. We do agree that he is competent to testify as to his belief that the two documents he observed in Rolling Meadows were wrongly stamped privileged, and that he had several conversations with Northrop employees about document searches in general, but we find that such evidence is entitled to little weight towards finding Northrop liable for discovery abuse. Pendergrass' affidavit and deposition testimony do not support the holding of an evidentiary hearing since even the matters for which he does have personal knowledge are either tangentially related to the Robinson case or else do not raise enough suspicion to warrant further

---

[9] The "control room" was apparently a location at the Rolling Meadows office from which numerous document productions were coordinated.

inquiry.

### Bright

Bright's knowledge about the document production for the Robinson case is even more limited than that of Pendergrass. He testified at his deposition that he had little knowledge about the Robinson matter at all. Although the relators contend that Bright's testimony supports their argument that Northrop falsely stamped documents privileged, the evidence belies this argument. Bright visited Rolling Meadows only one time, to assist in the search for documents. He is not sure which Northrop case he was working on during the trip.[10] Bright testified that he looked at between 50 and 75 boxes of documents while in Rolling Meadows, and several hundred of the documents were marked privileged. Although Bright could not remember the specific nature of any particular document, he believed that at least some of the documents had been wrongly stamped as privileged. When pressed as to the basis of his knowledge, he stated that he could look at particular documents, and "if they were related to things like paper towels or toilet paper or bringing radios to work or smoking areas or things like that, then obviously they are not privileged." (Bright dep. at 109-110).

Even if we find that Bright has sufficient knowledge to survive a Rule 602 challenge, we will not order an evidentiary hearing based on his testimony. Even assuming that he saw Robinson documents that were wrongly stamped as privileged (and this is a big assumption, given the generality of his testimony), there is no evidence that Northrop made

---

[10] Bright testified that he thought he might have been working on the Robinson case, because he remembered Pendergrass using that name. However, at the time Bright visited Rolling Meadows, in April, 1991, the Robinson complaint had not yet been unsealed, and thus Northrop was not aware of the allegations.

8

the designation purposefully, in order to prevent documents from being disclosed. By Bright's own statements, the documents he saw concerned mundane housekeeping matters, not damaging or incriminating information. If in fact the documents were not actually privileged (a supposition we are unable to confirm), the most reasonable inference to draw is that the documents were stamped by mistake.

### Wisniewski

Wisniewski assisted Pendergrass in scanning the 850 boxes of documents that the Rolling Meadows office sent to California prior to producing them to the relators. Wisniewski was not responsible for gathering any of the documents for production in the Robinson case. He went to Rolling Meadows only once in connection with the case, in March, 1995, to assist Pendergrass in setting up scanning equipment.

Although Wisniewski developed the general opinion that Northrop employees routinely destroyed documents to avoid their production on various cases, he had no specific knowledge or evidence that such occurrences happened in the Robinson matter; he did not discuss the Chapman attrition documents or the BOM documents at all. In fact, he could not testify about any specific instance where he remembered finding a particular responsive document in a trash can or somewhere else it was not supposed to be.[11]

Wisniewski next testified that in 1993, he wrote a memo documenting Northrop's

---

[11] Wisniewski testified that when he went to the various Northrop facilities looking for documents in other cases, he often found responsive documents in trash cans or otherwise placed in areas they were not expected to be. He thus formed the opinion that Northrop managers were trying to cover themselves by getting rid of incriminating evidence. However, even if it is true that Wisniewski routinely found responsive documents in trash cans (a proposition we find somewhat unbelievable, since it would require careful coordination between the day Wisniewski visited a facility to search for documents, the day a manager threw the documents away, and the janitorial schedule for emptying the trash cans), none of the documents related to the Robinson matter. Further, the mere moving of responsive documents from one location to another (as Wisniewski testified also occurred on other matters), is not, in itself, suspicious.

alleged discovery abuses to former in-house lawyer for Northrop, Joseph Costello. Costello allegedly told Wisniewski to destroy the memo and not mention these issues again.[12] However, nothing in the memo related to the Robinson matter specifically and the parties present no evidence of Costello's involvement in this matter other than the fact that he attended a settlement conference in 1998.

Finally, Wisniewski testified that during his work on various projects for Northrop, he had observed documents he believed were damaging to Northrop stamped as privileged, even though he believed that they might not actually be privileged. Again, Wisniewski could not specifically recall any Robinson documents that were stamped privileged. Further, he did not have any evidence – other than his own beliefs – that the documents he saw were intentionally mislabeled privileged. Indeed, Wisniewski did not have any evidence about whether the documents actually might have been privileged. The only type of documents he specifically remembered being stamped as privileged that appeared to be wrongly stamped were blank telephone pads. Again, like the memos regarding paper towels and radios observed by Bright, there is nothing incriminating about blank telephone pads, so nothing about his observations suggests that Northrop was deliberately trying to hide damaging information from production.

Similar to Pendergrass, Wisniewski's personal knowledge about document production is not closely tied to the Robinson matter. Wisniewski testified that over the course of his employment with Northrop he developed the opinion that various types of

---

[12] Bright also testified that he submitted a memo regarding alleged discovery abuse to Costello, by first giving it to Pendergrass. Bright never met with Costello or heard a response, but he testified that he heard from others that Costello was not pleased about the memo.

discovery abuse occurred on a regular basis. Even if Wisniewski's work with Pendergrass on the 850 Robinson boxes is enough to give him personal knowledge of the case, he gave little testimony about how that personal knowledge tied to his general observations about discovery abuse. Like Pendergrass, we find that Wisniewski's knowledge is entitled to little weight, and does not support a ruling ordering an evidentiary hearing.

Grider

Grider's alleged personal knowledge regarding the Robinson case is almost non-existent. He worked as a consultant for Northrop for less than two years, mostly in 1994 and 1995, and did not assist in the Robinson document production at all. The sum of Grider's "knowledge" came from conversations he had with Pendergrass about Pendergrass' general belief that Northrop's document production was "rotten."

Grider does not even have enough personal knowledge to survive a Rule 602 challenge. His second-hand information about Pendergrass' beliefs simply does not translate into personal observation or opinions about the Robinson matter.

In sum, after reviewing all the evidence, we find that the affiants have, at most, nominal personal knowledge concerning the document production in this case. Although they all (except Grider) testified that they formed general beliefs that Northrop may have engaged in shoddy or even misleading discovery in various cases, none of them could attribute a single specific incident to the Robinson production. And even if we find that the affiants had enough personal involvement in production to survive a Rule 602 challenge, the evidence they provide in support of plaintiffs' motion is entitled to little weight. None of them provided evidence regarding some of the specific allegations in this case, such as the alleged destruction of Chapman attrition or BOM documents, or the wrongful stamping

11

of AY documents as privileged. As for the information regarding Webster-Kwolek's supposedly incomplete search, we reviewed the affiants' testimony when deciding the motion regarding the taking of her deposition and found that it did not support an inference that Webster-Kwolek purposefully excluded anything from her search for documents. We simply do not find any reason to extend this issue further by conducting an evidentiary hearing on this matter. The affiants' testimony does nothing more than reiterate the relators' general allegations of discovery abuse without any hard proof. We thus deny the motions of the relators and the government for an evidentiary hearing and deny the relators' motion to impose sanctions against Northrop based on the issues discussed herein.[13] It is so ordered.

ENTER:

*[signature]*

MICHAEL T. MASON
United States Magistrate Judge

Dated: September 19, 2002

---

[13] As we stated above, we withhold our decision regarding whether Northrop abused the attorney-client privilege with regard to the engagement of AY, and whether sanctions are appropriate with respect to that matter.