# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge If Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 89 C 6111 | **DATE** | 11/4/2002 |
| **CASE TITLE** | Robinson vs. Northrop Grumman | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, Northrop's motion for protective order [633-1] is granted, plaintiffs' cross-motion to compel production of all Arthur Young documents [773-1] is denied but, by 11/25/02, Northrop must provide the Court with a more detailed explanation of privileged document 355 and must also produce any AY work papers that were used to support the Second Review, even if they were also used for the First Review, and must produce a privilege log for any work papers it contends are privileged. Plaintiffs' motion to strike Northrop's privilege claim [794-1] and to supplement motion for sanctions [794-2] are denied. Enter Memorandum Opinion and Order.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 10 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | NOV 5 2002 date docketed | 816 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | WB docketing deputy initials | |
| | Mail AO 450 form. | | | |
| ✓ | Copy to judge/magistrate judge. | | 11/4/2002 date mailed notice | |
| KF | courtroom deputy's initials | Date/time received in central Clerk's Office | KF mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
NOV 5 2002

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel, REX A. ROBINSON, and JAMES H. HOLZRICHTER,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION,<br><br>Defendant. | No. 89 C 6111<br><br>Hon. Ronald A. Guzman<br><br>Mag. Judge Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

A long-standing issue in this case revolves around defendant Northrop Grumman Corporation's ("Northrop") engagement of independent auditor Arthur Young & Company ("AY") for a series of projects in 1987 and 1988. All of the projects involved AY's analysis of Northrop's materials management systems. At the center of the dispute is the question of whether the first of these engagements (the "First Review") and the documentation that resulted is protected from production by the attorney-client privilege. Northrop claims that the First Review was undertaken by its legal department in anticipation of a wide-scale government audit as a way to gauge Northrop's regulatory compliance and potential liability. After the First Review concluded on September 18, 1987, Northrop's Materials Management Council (the "Council") engaged AY a second time (the "Second Review") for an in-depth, and non-privileged self-critical analysis of the same materials management system.[1] This review

---

[1] The Council, made up of non-lawyers at Northrop, was formed in mid-1987 for the specific purpose of reviewing the company's materials management systems in anticipation of a government audit and to plan for the
(continued...)

816

lasted nearly 18 months and resulted in a separate report, dated January, 1989.

The plaintiffs/relators (hereinafter, "plaintiffs" or "relators") claim that Northrop is improperly claiming that the attorney-client privilege protects the First Review, and that it merely funneled AY's work through the legal department in order to falsely concoct a privilege and withhold documents from the plaintiffs. They have filed a motion to compel the production of all AY documents, including the September, 1987 final report (and a second follow-up report from the First Review, incorrectly dated January, 1987[2]) contending that they are not truly privileged. In addition, the plaintiffs have filed a separate motion to strike Northrop's privilege claim, based on the recent production of an internal AY memorandum that the relators contend was wrongly withheld from production for over seven years, as well as a motion to supplement its previous motion for sanctions, based on the withholding of the document.[3]

Also before us is Northrop's motion for a protective order. This motion seeks to have the plaintiffs return a particular privileged document ("Document A") which Northrop inadvertently produced. The document appears to be a draft of AY's twelve conclusions from its First Review. A non-privileged memo prepared by Northrop finance director Duane Emling — which discusses each of the twelve conclusions — refers to these points as coming specifically from AY's final report, dated September 18, 1987 (withheld as privileged). On March 22, 2000, Magistrate Judge Rosemond found that another draft of AY's report, this one

---

[1](...continued)
eventual overhaul of the entire set of materials management systems.

[2] The parties agree that the date on this report is incorrect; AY was not engaged for the First Review until August, 1987 and the more likely date of this document is January, 1988.

[3] We denied the relators' motion for sanctions on September 19, 2002 based on the arguments raised therein, none of which pertained to AY issues. At that time, however, we left open the possibility of imposing sanctions based on the AY engagements. This opinion resolves that question.

2

created in January, 1988, was privileged. Northrop argues that Document A should similarly be found privileged, since it is merely an earlier draft of the report found privileged by Judge Rosemond.

In support of its opposition to plaintiffs' motion to compel, we allowed Northrop to file an *ex parte* submission explaining the differences between the allegedly privileged First Review and the non-privileged Second Review. Northrop also produced to us the other, related documents it is withholding on the ground of privilege. Finally, Northrop filed its own motion for sanctions against the relators, alleging discovery abuse on their end.[4]

All of the above motions (except for Northrop's motion for sanctions) are related to each other, as is the relators' motion to depose Northrop attorney Burks Terry regarding the First Review, which we denied on September 5, 2002. The main question underlying all of these issues is whether the First Review and all of the documents it generated, are protected by the attorney-client privilege, or whether Northrop's late production of allegedly important non-privileged AY documents justifies striking the privilege. Because the motions before us are so interconnected, we will address the relator's motion to compel the AY documents and its motion to strike Northrop's claim of privilege, as well as Northrop's motion for a protective order at once in this opinion.

As original support for its motion to dispel with Northrop's assertion of privilege, the relators submitted the affidavits of four former Northrop employees or consultants (the "affiants"). In their affidavits, the affiants alleged that they had knowledge that Northrop had abused the discovery process in this case, including wrongfully asserting the attorney-client privilege over non-privileged documents. We allowed Northrop to depose the affiants, and

---

[4] We denied this motion on September 26, 2002.

the depositions revealed little, if any, knowledge on their part about Northrop's discovery abuses, as we detailed more specifically in our order denying the relators' request for sanctions. Thus, we decline to take any action against Northrop based on the affidavits.

What we are left with is the question of whether the circumstances regarding the engagement of AY itself, or content of the documents we have reviewed *in camera*, compel a determination that Northrop has abused the use of the attorney-client designation. We denied the relators' motion to compel the deposition of Northrop attorney Burks Terry on the ground that at this time, any information he could provide about the AY engagement would be unnecessarily duplicative, unhelpful, and likely lead to more briefing of an issue that has already been briefed to death. In that opinion, we noted that we already had before us the various documents that the relators contend demonstrate a wrongful assertion of privilege as well as a solid understanding of each parties' position with regard to the documents, the depositions of various Northrop employees, and the First Review. Since the documents are relevant to this opinion as well, we will repeat that list here:

1. An August 7, 1987, letter from AY to Jack McNaughton (a non-attorney at Northrop) regarding an engagement to last from August 18 until September 11, 1987. The letter stated, among other things, that the primary focus of the review "is systems practices and procedures that relate to MRP in light of the 10 DCAA points. The primary emphasis will be the materials aspect of the operations,..." This document originally appeared on a Northrop privilege log but has since been produced.

2. An August 10, 1987 letter from Arthur Young to McNaughton. This letter proposes that Arthur Young will undertake a quick review and analysis of Northrop's DSD system, prior to Northrop conducting a later, complete review of existing manufacturing, financial, and government reporting systems. Arthur Young informed Northrop that at the end of this quick review (to last 15-20 days), it would provide a draft report and presentation of its conclusions. Again, Arthur Young indicates that it plans to undertake this project from August 18 until September 11, 1987. This document originally appeared on a Northrop privilege log but has since been produced.

3. An August 14, 1987 memo from McNaughton to an E. Foley (who has been

4

identified as a non-lawyer at Northrop), regarding the retention of Arthur Young for the above project. The memo mentions that the coordinator for the project and Arthur Young liaison would be Ken Beazley and names several other non-lawyers who would be involved in the project. The memo does not mention the legal department at all. This document did not appear on a Northrop privilege list and was produced in the ordinary course of discovery.

4. A letter from Burks Terry to Arthur Young dated August 14, 1987, submitted to the Court *in camera*. This letter retains Arthur Young for a privileged regulatory compliance review. This document appears on Northrop's privilege log.

5. An August 17, 1987 memo from Ken Beazley to the members of the materials management council and a copy to McNaughton informing them about the Arthur Young project and enlisting their help and support. This memo did not appear on a privilege log and was produced in the ordinary course of discovery.

6. An August 21, 1987 memo from Beazley to McNaughton about the status of the Arthur Young project. At the end of the memo, it states, "[t]his project is structured such that Arthur Young is engaged through Burks Terry as Division Counsel, so that attorney/client privilege is established." This document did not appear on a privilege log and was produced in the ordinary course of discovery.

Fueling the relators' contentions are the depositions they took of several Northrop business people who were involved in the Council, and whom Terry claimed directed him to engage AY to conduct the First Review through the legal department. As we explained in our opinion denying the relators' motion to depose Terry, the testimony of the Northrop employees certainly did not help substantiate Northrop's position that AY was engaged for the First Review by Terry specifically at the request of Northrop DSD's Divisional President, Wallace Solberg. Indeed, none of the Northrop employees recalled Terry's involvement in the AY engagement, and none of them testified about a privileged First Review versus a non-privileged Second Review. Given the length of time that has elapsed since the events in the case, the fact that the First Review lasted a mere month, and, as we explain below, the fact that the First and Second Reviews did overlap to some extent, such failures of memory are

5

not fatal to Northrop's case. But they don't help it, either.

There is another document in this case that is relevant to our analysis. Soon after the completion of the First Review on September 18, 1987, Duane Emling, an ad hoc Council member, sent a memo to "Distribution" titled, "Evaluation of Arthur Young Findings". This memo stated, among other things, "I believe that the current planned activities established for the Material Enhancement Project are in close concert with the findings of Arthur Young. I have taken this opportunity to describe what actions are currently planned relative to each of the Arthur Young findings." Emling then goes on to describe twelve topics that apparently formed the basis of AY's conclusions in its privileged report, dated September 18, 1987. We have no evidence before us regarding the identities of the individuals on the distribution list (or whether they received the privileged AY report as well).

To determine whether the attorney-client privilege protects a document or documents, the Seventh Circuit applies the following rule: "1) where legal advice of any kind is sought 2) from a professional legal advisor in his capacity as such, 3) the communications relating to that purpose, 4) made in confidence 5) by the client, 6) are at his instance permanently protected 7) from disclosure by himself or by the legal advisor, 8) except where the privilege has been waived." 8 WIGMORE § 2292; *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 319 (7th Cir. 1963).

In this case, Northrop argues that it sought legal advice concerning its potential liability in the case of a DCAA[5] audit from Terry, who engaged AY to help provide that legal advice. Northrop has provided the Court with an *ex parte* submission of all of the AY documents it is withholding on the grounds of privilege, so that we may undertake a document-by-document

---

[5] DCAA refers to the Defense Contract Audit Agency, the government entity responsible for overseeing and auditing the work performed for the government by private companies such as Northrop.

6

analysis of them as required by *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992). Included in the submission is a copy of the allegedly privileged First Review as well as a copy of the non-privileged Second Review, which was the result of an additional eighteen months of work by AY. The purpose of the Second review was "to identify the extent of compliance deficiencies, to observe the financial potential from change and to reflect on the alternative courses of action open to the Division." (January, 1989 report, pg. 1).

The relators do not disagree that, in theory at least, an in-house attorney's engagement of an outside auditor to help provide legal advice to a corporation may be protected by the attorney-client privilege. Instead, they take issue with this particular engagement, arguing that AY was hired for a purely business purpose, not a legal one.

The relators contend that Northrop merely "funneled" the First Review through the legal department in order to mask what they believe was an unflattering analysis of Northrop's materials management system. Northrop contends that the First Review and all of the documents it generated plainly adhere to the rules for establishing the attorney-client and work-product privileges, and none of the relators' suspicions have any merit. In support of this contention, Northrop also provided *in camera* a non-argumentative comparison of the two projects to demonstrate its contention that it did not merely funnel the First Review through the legal department in order to mask an unflattering analysis.

Because we ruled above that the relators cannot rely on the affiants to support their claim that Northrop has wrongly asserted a claim of privilege over the AY documents from the First Review, we must instead determine whether any other factors connected to the review compel us to strike the privilege. After reviewing all of the documents, including Northrop's *ex parte* submission, we are satisfied that the purpose of the First Review was to provide a

legal analysis of Northrop's materials management systems and that the reports it generated and other documents we reviewed *in camera* are covered by the attorney-client privilege, with one caveat we will describe below. However, because there is an overlap in the facts underlying the First and Second Reviews, including the scope of inquiry AY undertook to make its conclusions, we find that any background documentation, work papers, interview notes, and the like that AY used in the First Review that it also used in any way in the Second Review, is not privileged and must be produced.

The relators contend, not unreasonably, that the August, 1987 documents listed above demonstrate that the AY engagement was initially conceived and planned by the Council and only later redirected through the legal department. It is true that in late July and early August, 1987, various Northrop business people, such as McNaughton and Solberg, were discussing the impending DCAA government audit of Northrop's materials management systems, and considering undertaking an internal self-critical analysis of the same issues. The initial contact with AY appears to come from McNaughton. Very soon thereafter, Burks Terry and the legal department got involved in the engagement (prior to its commencement), and from then on, the project was conducted for the purpose of providing an overview of Northrop's compliance with government regulations under the auspices of the attorney-client privilege.

Although it may very well be true that the initial conception of the First Review did not entail a legal aspect, we see nothing wrong with the circumstances surrounding the legal department's subsequent involvement. The engagement had not begun at the time the legal department became involved and it is not unusual for a project's scope to change from the time of its original conception to its actual implementation.[6] In this case, Terry and the legal

---

[6] The relators argue that AY's own internal engagement notice, dated August 24, 1987, demonstrates that
(continued...)

department contacted AY within days of Council member McNaughton; there is no evidence that Northrop sought after-the-fact protection of a potentially damaging report.[7] Instead, the First Review did not begin until after the privilege was established.

So we agree that, at the least, Northrop intended for the First Review to be privileged and to be used by Terry to provide legal advice to the company. The question is whether the report actually produced in September, 1987 and its supporting documentation fulfill the requirements to establish the privilege.

After reviewing the materials provided to us *in camera* and considering the parties' arguments, we do agree that the First Review was conducted in order to provide Terry with the ability to give legal advice to Northrop, and therefore is privileged. Further, we determine that although it appears that certain conclusions from the First Review were used to define the scope of the Second Review, we find that Northrop has produced to the plaintiffs those documents that contain such factual information and conclusions, without delving into any legal analysis or information.[8]

---

[6](...continued)
there was no legal purpose to the First Review, since the notice names McNaughton as the main contact. However, this notice cites to the August 10, 1987 engagement letter from McNaughton, not Terry's August 14, 1987 engagement letter. We do not know if another engagement notice was prepared to reflect the legal department involvement or whether AY simply went forward on the basis of this notice. Either way, Northrop does not deny that Terry identified McNaughton to AY as a major contact for the First Review, so it is not unusual that he was named on AY's engagement form.

[7] The relators argue that Northrop most likely knew that any analysis of its materials management systems would be unflattering, as the company had been discussing it systems' weaknesses for several years. That may be so, but as we noted in reviewing documents produced in connection with the Second Review, that review also highlighted weaknesses and problems with Northrop's materials management systems, including ways in which the systems might be out of compliance with government regulations. The difference is that the first review intended to provide Terry with an overview of possible legal liability and the second review focused, among other things, on possible means of correcting the problems.

[8] The relators argue that documents used by an in-house attorney acting in a business, rather than legal, capacity are not privileged, citing *Latuga v. Hooters*, No. 93 C 7709, slip op. at 2-3 (N.D.Ill., Jan. 11, 1996)(unpublished). However, the evidence before us suggests that Terry's role in AY's work was purely for the
(continued...)

9

For example, the memo by Emling supports Northrop's contention that it has asserted a privilege over only those documents that contain a legal analysis, not the facts supporting that analysis. Many of the issues AY reviewed in its privileged report, as stated in Emling's non-privileged memo, can be found (albeit in somewhat different form) in the 1989 non-privileged AY report with AY's analysis.[9] Although we initially found it curious that Northrop would produce Emling's memo at all, since it so obviously relates to the First Review, closer analysis shows that it does not contain any of AY's privileged observations, only factual conclusions. Second, in a letter dated September 9, 1987 from AY to Ken Beazley, there is discussion about the Second Review which indicates that AY may undertake some of the same procedures and analysis that it used in preparing the First Review, but this time for a different purpose. For example, it again discusses the 10 DCAA original common deficiencies that Beazley mentioned in his August 21, 1987 Council report concerning the First Review. And finally, although we cannot reveal the substance of documents produced to us *in camera*, we note that at least two discuss the legal department's plans for following up on issues raised in the First Review, a wholly separate undertaking from plans that the Second Review generated.

Our determination that documents related to the First Review (which basically include drafts of the final report and correspondence) are privileged includes the document Bates numbered NCLg007-0182-0183 which was inadvertently produced to the plaintiffs and is the

---

[8](...continued)
purpose of providing legal advice and that any business decisions regarding Northrop's materials management systems stemmed from the Second Review and were overseen by Northrop business people. And to the extent that the inquiry in the Second Review mirrored that of the First, Northrop has produced all of its documents discussing the factual underpinnings of the audits, which were then used by Northrop's business decision makers. Only the First Review final reports, created for Terry's legal analysis, have been withheld as privileged.

[9] For example, item number two on Emling's list is "Basis for Costing Material Transfers". Page seventeen of AY's non-privileged report contains a section covering "Material Transfer Costing".

subject of Northrop's motion for protective order. The document must be returned to Northrop. There is one document, number 355 on Northrop's privilege log, that does not clearly appear to be related to the First Review, as opposed to the Second. This document consists of notes and a summary from AY's interview of a Northrop employee, which occurred in December, 1987. Since the First Review, and all of the interviews that supported it, were completed by September 18, 1987, it is not apparent why this later interview – the only one taken in December – is also privileged. It is true that AY produced several privileged documents to follow up the First Review in early January, 1988, but the content of the interview notes does not indicate the predicate for this interview, or whether it might in fact be either part of the Second Review or used for both the First and Second Reviews (in which case it must be produced). Northrop is therefore ordered to provide the Court with a more detailed explanation (*in camera*, if necessary) of the purpose of this document, so that we may determine whether to uphold the claim of privilege.

Next, the relators argue that they have not been provided with work papers to support AY's work for Northrop. We agree with the plaintiffs that documents created for a business, rather than legal, purpose are not privileged. See *In re Air Crash Disaster at Sioux City*, 133 F.R.D. 515, 519 (N.D.Ill. 1990). In submitting its privileged AY documents to us for an *in camera* review (and there were only ten), Northrop informed the Court that it also had several binders of work papers it was not producing unless we asked to see them. It is these work papers that are of interest, since the relators argue that they have never even received copies of work papers used for the Second Review, which implies that AY may have used the same background documentation for both projects.

If this is true, such papers must be produced because they have been used for a

11

business, rather than purely legal, purpose. If Northrop believes that such papers were used solely for the First Review, it must provide a privilege log describing them individually and must also provide the relators with AY's work from the Second Review.

Finally, the relators argue that Northrop's belated production – only days before the close of discovery – of a 1988 internal AY document that discusses Northrop's materials management systems in an unflattering manner demonstrates that Northrop has purposely withheld damaging non-privileged documents. Northrop explains that the document originally appeared on AY's privilege log because AY believed that the document related to the First Review. Only when Northrop and AY revisited the privilege issue in response to the June, 2001 grand jury subpoena, did they determine that the majority of the document actually referred either to the Second Review, or to other, non-privileged matters. By some inadvertence, Northrop failed to produce the document to the plaintiff at the same time it was produced to the grand jury.

For several reasons, we disagree with the relators that the circumstances surrounding the production of this document compel us to strike Northrop's claim of privilege. First, the document is an internal AY memo; Northrop never had it in its possession. AY, not Northrop, made the original determination that the document was privileged and identified it on its privilege log.[10] As an initial matter, we find the fact that AY was segregating certain documents related to some of its work for Northrop because they were covered by the attorney-client privilege lends credence to Northrop's claim that its First Review was in fact a privileged undertaking. If neither of the projects were privileged, AY would have had no

---

[10] AY's privilege log is fairly short, grouping categories of documents together under the heading of privileged instead of identifying each document individually. There is no evidence that the plaintiffs ever objected to this type of privilege log or inquired more closely about any document or type of document identified by AY.

12

need to create a privilege log at all, or at least not one that covered the bulk of its work on the First Review. As we explained above, there was overlap between the subject matter of the First and Second Reviews, so it is not surprising that AY or Northrop may have mistakenly identified some documents as belonging to the wrong review.[11]

More importantly, a review of the document demonstrates that it does not contain any new or surprising information regarding AY's analysis of Northrop's materials management systems. The majority of the memo concerns AY's description of Northrop and the two projects AY undertook, as well as a discussion of AY's chances of obtaining more work from Northrop. The only piece of the document that is critical of Northrop's systems discusses two issues: 1) Northrop's provisioning process, critiquing it for buying all materials for a project following the awarding of a contract, and then often dumping some of that material which was made obsolete by engineering changes; and 2) Northrop's awkward inventory control system. Both of these criticisms are also discussed in Northrop's non-privileged final report dated January, 1989. Specifically, the tracking of excess material by contract is discussed on page 18 (items 2 and 3) and the problem of "up front" purchases of materials which might then later become obsolete is discussed on pages 19 (item 6) and page 27. Inventory control problems are discussed in numerous places throughout the report as well. Further, other issues raised in the January, 1988 memo are also mentioned in the non-privileged report, such as the need to correct Northrop's cultural bias against spending necessary money on systems upgrades in order to improve compliance and performance (pages 5 and 6), and the overall weakness of Northrop's computer systems in general (pages 2 and 3). Northrop states, and the relators do not dispute, that the relators have not used the Second Report as a basis for questioning

---

[11] The relators did not depose any AY consultants about their work on either the First or Second Reviews, so we do not have any evidence about the creation of some of the documents at issue.

13

in any deposition. Since there is no evidence that the relators have focused on the criticisms contained in the Second Review to support their claims of accounting fraud, we cannot say that their failure to obtain the AY memo (which contained these same criticisms) earlier, caused them any prejudice.

For the above reasons, Northrop's motion for protective order is granted. The plaintiffs' motion to compel the production of all AY documents is denied, but Northrop must provide the Court with a more detailed explanation of privileged document 355 and must also produce any AY work papers that were used to support the Second Review, even if they were also used for the First Review, and must produce a privilege log for any work papers it contends are privileged. Finally, the plaintiffs' motions to strike Northrop's privilege claim and to supplement their request for sanctions are denied. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated: November 4, 2002